IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SMARTEN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-1381 (LMB/IDD) |
| | ) | |
| SAMSUNG ELECTRONICS AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court is defendant's Motion to Dismiss [Dkt. No. 15] pursuant to Fed. R. Civ.

P. 12(b)(6), in which defendant argues that this patent infringement action should be dismissed

because none of the patents-in-issue are patent-eligible under 35 U.S.C. § 101. Plaintiff has

responded to the motion and oral argument has been held. For the reasons that follow,

defendant's Motion to Dismiss will be granted.

I.    BACKGROUND

Plaintiff SmarTEN LLC ("plaintiff" or "SmarTEN") alleges that defendant Samsung

Electronics America, Inc. ("defendant" or "Samsung") has infringed on four patents which

SmarTEN owns: Patent Numbers 9,280,640 ("'640 patent"); 9,378,657 ("'657 patent");

9,514,655 ("'655 patent"); and 9,728,102 ("'102 patent"). Compl. [Dkt. No. 1] ¶ 4.

The four patents-in-suit, all of which are continuations of the same parent application,

disclose a "mobile computing device executing weight, nutrition, health, behavior and exercise

application software" that "serves as a simulated combination personal trainer and

dietician/nutritionist for the user using comprehensive databases storing personalized health,

nutrition and exercise information." '640 patent abs. The patents include 132 claims, each of

which recites a "hand-held mobile weight and exercise management computing device," see '640 patent 88:65-67, or a "hand-held mobile nutrition and physical activity management computing device," see '102 patent 100:11-12. When the applications for these patents were filed, there were many "commercial programs," such as Weight Watchers, as well as "individual health care professionals" and "multidisciplinary medical weight management centers" that provided clients with "nutritional and exercise direction along with help to keep on track." '640 patent 2:6-16. In addition, these services had already been incorporated into applications for mobile devices and tablets such as iPhones and iPads designed "to assist dieters in successfully meeting their weight loss goals," id. at 2:36-38; however, according to the patents, there existed a "need for an easy to use weight, nutrition, exercise and behavior monitoring data processing system that, for example, simplifies data entry for food consumed and/or exercise modes of operation and/or behavior parameters, while providing valuable health beneficial feedback and rewards for behavior change and goal achievement," id. at 3:3-8. Accordingly, the patents claim to provide software that "serves as a simulated personal trainer, dietician/nutritionist, and physician's assistant for the user while having access to massive amounts of personalized health, nutrition and exercise information." Id. at 3:20-23.

At bottom, the invention claimed by the patents is a handheld device with software that processes, organizes, and displays nutrition and exercise data and provides feedback to the user. Although the patents claim a "device," they describe software which "may be implemented by any of a wide array of commercially available, conventional mobile computing devices, including, for example, conventional smart phones, such as Apple's iPhone 4s or 5, or Samsung's quad-core processor-based Galaxy S3, a tablet computing device such as Apple's iPad, or any of a number of laptop computers." Id. at 10:23-28. Similarly, although the claims

2

reference other hardware, such as a pedometer, a GPS, and a digital camera, see, e.g., id. at 89:22-25, 91:53-57, the patents do not purport to invent any such hardware, but instead make clear that the hardware included on conventional mobile computing devices may be used as part of the invention, see id. at 10:32-33, 10:64-65, 44:62-64.

Plaintiff alleges that on February 8, 2017, it sent defendant a letter to advise it that its products were infringing the '640, '657, and '655 patents, and included a copy of the entire '640 patent and the claims of the '657 and '655 patents. Compl. ¶ 5. Using claim 1 of the '640 patent as an example, the letter explained that Samsung's smartphones with a built-in S Health App[1] infringed plaintiff's patent. Id. Plaintiff alleges that Samsung did not respond to the letter but instead has continued to sell infringing smartphones. Id. ¶ 6. Plaintiff also alleges that, once the '102 patent issued on August 8, 2017, Samsung's sale of smartphones with the built-in S Health App also infringed that patent. Id.

In this litigation, plaintiff alleges that all Samsung Galaxy S7 and S8 Series smartphones, as well as all Note 8 Series smartphones, that had the built-in S Health App and were sold in the United States on or after the issue date of each patent literally and directly infringe claims 1-3, 5-7, 9-10, 13-20, 24, 26-28, 30, 32, 34, 41, 43-44, 46, 50, 54, and 56 of the '640 patent (issued on March 8, 2016); claims 1-8, 11, 13-15, 17, 19, and 21 of the '657 patent (issued on June 28, 2016); claims 1-9, 11, 13-17, 20, and 22-23 of the '655 patent (issued on December 6, 2016); and claims 26-30 of the '102 patent (issued on August 8, 2017). Id. ¶ 7. In addition, plaintiff alleges that Samsung's infringement has been wanton, willful, and intentional. Id. ¶ 8.

---

[1] Apparently, the name of the application was changed at some point from the "S Health App" to the "Samsung Health App." Compl. ¶ 5. For the sake of clarity, this Memorandum Opinion will refer to the application as the "S Health App."

As a result, plaintiff seeks compensatory damages adequate to compensate it for Samsung's infringement, as well as treble damages and costs pursuant to 35 U.S.C. § 284 and attorney's fees pursuant to 35 U.S.C. § 285, as well as an injunction. Id. at 4. Samsung has filed a Motion to Dismiss, in which its sole argument is that each claim asserted against Samsung is invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter, as explained by Alice Corp. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014).

## II.    DISCUSSION

### A.  **Standard of Review**

Under Rule 12(b)(6), a civil action must be dismissed if the complaint does not "contain sufficient facts to state a claim that is 'plausible on its face.'" E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although the court must assume for the purposes of deciding the motion that all "well-pleaded allegations" are true and must "view the complaint in the light most favorable to the plaintiff," Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009), allegations that are merely conclusory need not be credited, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Under 35 U.S.C. § 282(a), a "patent shall be presumed valid" and the "burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." This presumption requires the party asserting invalidity to "set forth clear and convincing evidence of invalidity." Senju Pharm. Co. v. Lupin Ltd., 780 F.3d 1337, 1353 (Fed. Cir. 2015). A concurring opinion in a previous en banc Federal Circuit decision has observed that this "presumption applies when § 101 is raised as a basis for invalidity in district court proceedings," CLS Bank Int'l v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1284 (Fed. Cir. 2013) (en

4

banc) (Lourie, J., concurring); however, in affirming the judgment of the Federal Circuit in Alice and articulating the test for patent-ineligibility that is implicated by defendant's Motion to Dismiss, the Supreme Court declined to discuss the presumption of validity and did not make any findings by clear and convincing evidence, see Alice, 134 S. Ct. 2347. Moreover, recent Supreme Court and Federal Circuit decisions addressing § 101 invalidity claims have done so without applying a clear and convincing evidence standard. See, e.g., Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576 (2013); Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356 (Fed. Cir. 2018). Although it appears to the Court that the weight of the relevant case law indicates that the presumption of validity is not applicable to an ineligibility determination under § 101, the Court finds that Samsung has made the relevant invalidity showing by clear and convincing evidence. Accordingly, the Court does not find it necessary to resolve this dispute.

### B. Analysis

Under the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. Although not evident from the text of this provision, § 101 has been interpreted for more than 150 years to contain an "important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." Alice, 134 S. Ct. at 2354 (internal quotation marks omitted). This "exclusionary principle" is driven by a concern of "pre-emption." Id. Because laws of nature, natural phenomena, and abstract ideas are the "basic tools of scientific and technological work," granting patent-holders a monopoly on them might "tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." Id. (internal quotation marks omitted).

At the same time, because "all inventions," at some level, "embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." Id. (internal quotation marks omitted). Accordingly, the Supreme Court has distinguished between patent-ineligible claims of abstract ideas and patent-eligible "integrat[ions]" or "applications of such concepts to a new and useful end." Id. (alterations and internal quotation marks omitted). To that end, the Supreme Court has developed a two-part analysis for determining whether a patent is invalid for claiming abstract ideas.[2] First, the court must "determine whether the claims at issue are directed to" an abstract idea. Id. at 2355. Second, if so, the court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." Id. (internal quotation marks omitted). This second step is, at its core, a "search for an inventive concept— i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." Id. (alteration in original) (internal quotation marks omitted).

Before applying the Alice test, the Court must determine whether a single claim is representative of the asserted claims for purposes of Alice. Samsung argues that Claim 1 of the '640 patent is representative of each asserted claim. This claim recites, in full:

---

[2] SmarTEN briefly, and unpersuasively, argues that "no Alice analysis is even necessary here" because the claims require various machine components, such as a pedometer and a GPS receiver, Pl. Opp. 8-9; however, the Supreme Court and the Federal Circuit have applied the Alice test to a variety of patents that recite various hardware components, see, e.g., Alice, 134 S. Ct. at 2360 (explaining that "system claims [that] recite a handful of generic computer components configured to implement" an abstract idea should be analyzed in the same way as "method claims [that] recite the abstract idea implemented on a generic computer"); Intellectual Ventures I LLC v. Capital One Fin. Corp., 850 F.3d 1332, 1339-42 (Fed. Cir. 2017); FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1094-96 (Fed. Cir. 2016).

A hand-held mobile weight and exercise management computing device having a housing sized to be held in a user's hand comprising:

a storage subsystem for storing health information including a user profile, said storage subsystem being operable to store health information about a user, including body weight, pulse rate information, a calorie-related daily goal, and an exercise-related goal, said storage subsystem being further operable to store data relating to a plurality of user-selectable foods and to store data relating to a plurality of user-selectable exercises;

a touch screen display operable to display food-related and exercise-related information to said user;

a user interface operable to receive input from said user and to communicate output to said user, said user interface including a plurality of user interface displays displayable on said touch screen display; said user interface being operable to selectively initiate entry into said user profile or at least one food-related operation or at least one exercise-related operation, said user interface including a plurality of user-selectable symbols; said user-selectable symbols being operable to initiate entry into said user profile or at least one food-related operation or at least one exercise-related operation;

a GPS receiver in said housing operable to receive input GPS data;

a pedometer in said housing operable to generate step-related data;

said user interface being operable to display on said touch screen display in said housing: a food mode symbol, a first exercise mode symbol for initiating an exercise mode that uses position coordinate information based upon said input GPS data, and a second exercise mode symbol for entry of data regarding a plurality of exercise modes that do not use position coordinate information based upon said input GPS data;

a processing subsystem, operatively coupled to said user interface, said GPS receiver, said pedometer, said touch screen display, and said storage subsystem, said processing subsystem including:

a food monitoring subsystem being operatively coupled to said storage subsystem and being operable to receive food-related data from said user, via said user interface, including data identifying a first set of foods input by said user, and being operable to link said first set of foods to a specific user meal, said first set of foods including a first food and a quantity-related parameter identified by said user;

said food monitoring subsystem being operable to determine the calories expected to be consumed by said user upon eating said first food, and to store

7

food-related information in said storage subsystem relating to said first food, including information relating to the nutritional content of said first food and the calories consumed by said user upon eating said first food, based in part on said food-related data from said user;

said food monitoring subsystem, in response to user selection of said food mode symbol, being further operable to generate a food selection display screen identifying a plurality of meal category symbols that allow the user to select a meal category including a breakfast category symbol, a lunch category symbol, a dinner category symbol, and a snack category symbol;

said food monitoring subsystem being further operable to generate a nutritional rating based at least in part on a combination of nutrient parameters in said first food of said first set of foods; said nutritional rating being further based upon nutritional rating values ranging from low values, indicating a relatively undesirable combination of nutrient parameters, with respect to at least one health-related goal, to high values, indicating a relatively desirable combination of nutrient parameters, with respect to said at least one health-related goal; said food monitoring subsystem being further operable to generate a display of said nutritional rating to said user via said user interface on said touch screen display;

said food monitoring subsystem being further operable to generate a display of protein and fat content of at least said first food selected by said user, wherein said nutritional rating is based in part on the protein and fat content of said first food;

said food monitoring subsystem being further operable to generate a list of said user's favorite foods in response to food-related inputs by said user during food selection for said specific user meal; and

an exercise monitoring subsystem being operatively coupled to said storage subsystem and, in response to user selection of said first exercise mode symbol or said second exercise mode symbol, being operable to receive exercise-related data from said user, via said user interface, including data identifying a first exercise expected to be performed by said user;

said exercise monitoring subsystem being operable to determine the calories expected to be burned by said user upon performing said first exercise, and to store exercise-related information in said storage subsystem relating to said first exercise, including the calories burned by said user and an exercise quantity-related parameter upon said user performing said first exercise, based in part on data from said user;

said exercise monitoring subsystem being further operable to analyze data related to user performance of at least one exercise, and to generate exercise feedback for said user relating to said at least one exercise;

8

said exercise monitoring subsystem, in response to user selection of said first exercise mode symbol, being further operable to receive exercise data including user location data via signals received from said GPS receiver, to determine user distance traveled using location data from said GPS receiver, and to track user distance traveled and duration traveled;

said exercise monitoring subsystem, in response to user selection of said first exercise mode symbol, using said user location data received from said GPS receiver in said hand-held housing, being further operable to generate the current location of a motion-related exercise, and to generate a visual depiction in real time indicating the user traversing the path defined by said user location data;

said exercise monitoring subsystem being further operable to associate each of a set of exercise levels with at least one user-selectable exercise, said user-selectable exercise including an associated exercise parameter combination;

said exercise monitoring subsystem being further operable to allow said user to select a user-selectable exercise to be performed from any one of said exercise levels from said storage subsystem;

said set of exercise levels ranging from a low exercise level, linked to an exercise with an associated exercise parameter combination that may be performed by users having a relatively low fitness level, to a first high exercise level, linked to an exercise having an exercise parameter combination requiring a relatively high fitness level to perform; said set of exercise levels including a second high exercise level, linked to an exercise requiring a relatively high fitness level to perform, where said second high exercise level is at a lower exercise level than said first high exercise level, but at a higher exercise level than other exercise levels in said set of exercise levels, based upon a comparison of exercise parameter combinations associated with exercises of respective exercise levels being compared;

said exercise monitoring subsystem being further operable, to receive said step-related data from said pedometer, to determine the number of steps taken by said user during a step-related exercise, and to calculate the distance traveled during said step-related exercise;

said processing subsystem being operable to generate a prompt for said user to enter an exercise-related goal;

said processing subsystem being further operable to monitor said user's weight over time, and being operable to receive user weight data from said user interface and to store said user weight data in said storage subsystem, said processing subsystem being further operable to generate a weight-related display visually depicting a plurality of instances of said user's weight over time on said touch screen display;

said touch screen display being operatively coupled to said processing subsystem to provide feedback to said user relating to progress towards meeting said daily calorie-related goal, to display at least some of said user's favorite foods to aid in food data entry by said user, to display said nutritional rating to said user, and to display said protein and fat content of at least said first food selected by said user; and being further operatively coupled to display the current location of said motion-related exercise, to display said visual depiction of said motion-related exercise in real time indicating the user traversing the path defined by said user location data while the user is moving along said path, and to display to said user at least one current exercise parameter during the user's performance of an exercise.

'640 patent 88:65-91:36.

The various other asserted dependent claims are not meaningfully different from Claim 1, and even the other asserted independent claims make only insignificant tweaks to the device described in this claim.[3] For example, dependent Claim 5 claims only the "device according to claim 1, further including a camera, wherein said food monitoring subsystem is operable to receive image data from said camera of a [sic] least one food item," id. at 91:53-57, and dependent Claim 10 claims only the "device according to claim 1, wherein said processing subsystem is operable to store in said user profile data indicative of said user's age and height," id. at 92:29-32. As will be discussed below, the reason Claim 1 is directed at patent-ineligible subject matter is because it is primarily directed to collecting, analyzing, and displaying data, and the other asserted claims involve only slight adjustments or additions to the ways in which the device described in Claim 1 of the '640 patent collects, analyzes, and displays data. Accordingly, the Alice analysis applies similarly to all of the asserted claims.

---

[3] SmarTEN contends that "many claims besides claim 1 of the '640 patent illustrate a new and useful improved machine." Pl. Opp. 21 (formatting altered). SmarTEN's argument on this point is merely a list of claims from the '640 patent, as well as the other patents, that are different in some respect from Claim 1 of the '640 patent. See id. at 21-26. Although SmarTEN is correct that the various other asserted claims are not identical to Claim 1 of the '640 patent, SmarTEN makes no attempt to argue that the differences among the claims are relevant to the § 101 analysis, and the Court's review of the claims has convinced it that Claim 1 is properly representative for this purpose.

Moreover, the patent prosecution history confirms this conclusion. All of the claims in the '657 patent and the '102 patent were rejected for being "not patentably distinct from" the claims of the '640 patent, leading the patentee to file a terminal disclaimer with respect to each patent rather than contest the rejection. See Def. Mem. Ex. G, at 4; id. Ex. I, at 3-4.[4] For the '655 patent, SmarTEN preemptively filed a terminal disclaimer to avoid such a rejection. Id. Ex. H, at 3. Although SmarTEN argues without elaboration that there is no "relationship between obviousness type double patenting and patent eligible subject matter," the conclusion by both SmarTEN and the Patent Office that its later-filed patents are "not patentably distinct from" the claims of the '640 patent only reinforces the Court's conclusion that Claim 1 of the '640 patent is representative of plaintiff's invention.

    1.  Abstract Idea

The first Alice step addresses whether the asserted claims are "directed to a result or effect that itself is" a patent-ineligible abstract idea. Smart Sys. Innovations, LLC v. Chi. Transit Auth., 873 F.3d 1364, 1371 (Fed. Cir. 2017) (internal quotation marks omitted). For example, in Electric Power Group, LLC v. Alstom S.A., 830 F.3d 1350, 1351 (Fed. Cir. 2016), the Federal Circuit reviewed a group of patents that "describe[d] and claim[ed] systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." The representative claim recited a "method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the" grid by receiving data from a plurality

---

[4] The doctrine of obviousness-type double patenting prohibits "the issuance of the claims in a second patent not patentably distinct from the claims of the first patent," In re Longi, 759 F.2d 887, 892 (Fed. Cir. 1985), and, in particular, prohibits a patentee from obtaining a second patent for an "obvious" modification of a previously patented invention, see id. A patentee may avoid such a rejection by filing a "terminal disclaimer," which disclaims any portion of the term of the second patent past the end of the term of the first patent. See id. at 894.

of grid and non-grid sources; analyzing and updating the data metrics in real time in areas such as voltages, power flows, damping, and oscillation modes; and displaying various visualizations of the measurements and metrics. Id. at 1351-52. In short, the "focus of the asserted claims" was on "collecting information, analyzing it, and displaying certain results of the collection and analysis." Id. at 1353. In analyzing this claim, the Federal Circuit began with the well-accepted rule that because "[i]nformation as such is an intangible," "collecting" and "analyzing information," as well as "presenting the results of abstract processes of collecting and analyzing information," are all "within the realm of abstract ideas." Id. at 1353-54. Although the Federal Circuit recognized that an advance based on a "particular assertedly inventive technology" for "gathering and analyzing information of a specified content, then displaying the results" could be patent eligible, the asserted claims in Electric Power Group were found to be "clearly focused on the combination of th[e]se abstract-idea processes" of gathering, analyzing, and displaying data and, as such, the Federal Circuit held that they were directed to an abstract idea. Id. at 1354.

Samsung argues that the asserted claims at issue in the present civil action fall directly within the lines drawn in Electric Power Group. The Court agrees. Like the claims in Electric Power Group, the claims here are primarily directed at collecting, analyzing, and displaying data. Specifically, Claim 1 of the '640 patent describes a set of subsystems that collect and store health, food, exercise, and weight data from the user and other sources; step-related data from a pedometer; and location data from a GPS receiver. '640 patent 89:1-52, 90:15-30, 91:14-21. The claim further describes how the subsystems can analyze the data to determine, for example, the calories contained in particular foods or burned by particular exercises, to evaluate user performance and the user's weight, and to provide feedback to the user about his progress toward his health goals. Id. at 89:38-45, 90:23-54, 81:14-36. Lastly, the claim describes how the device

can display nutritional ratings, a number of different symbols, and "food-related and exercise-related information," as well as "generate a visual depiction" of the user moving in real time. Id. at 89:9-33, 89:54-90:15, 90:42-49. Taken together, these descriptions make clear that Claim 1 is directed at collecting, analyzing, and displaying data, which is a patent-ineligible abstract idea.

In response to this simple application of Electric Power Group, SmarTEN primarily argues that the claims are not directed to an abstract idea but instead are "directed to specific means for improving the claimed mobile weight and exercise management computing device." Pl. Opp. 13 (formatting altered). SmarTEN specifically cites as improvements the inclusion of a pedometer and GPS receiver, id. at 14-15; the display of the user's path in real time using GPS data, id. at 15; the ability to select GPS-based exercises directly from the initial user interface, id. at 16-17; and the generation of lists of a user's favorite foods, id. at 17-18. This argument is unpersuasive. As Federal Circuit precedent makes clear, a claim is directed to the improvement of a device when it is focused on "a specific improvement—[such as] a particular database technique—in how computers c[an] carry out" a function, rather than on "asserted advances in uses to which existing computer capabilities could be put." Electric Power Group, 830 F.3d at 1354; see also, e.g., Smart Sys. Innovations, 873 F.3d at 1372 ("The question in such cases is whether the focus of the claims is on the specific asserted improvement in computer capabilities or whether computers are invoked merely as a tool." (internal quotation marks omitted)); Visual Memory LLC v. NVIDIA Corp., 867 F.3d 1253, 1259 (Fed. Cir. 2017) ("[T]he claims here are directed to a technological improvement: an enhanced computer memory system."); Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1339 (Fed. Cir. 2016) ("In sum, the self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory. . . . [T]he claims are directed to a specific

implementation of a solution to a problem in the software arts."). SmarTEN does not claim either

in its patent or its brief that the patent is directed to any technological advance or solution to a

technological problem. Instead, it is clear that the claims in issue are directed to asserted

advances in the uses to which already existing technology, particularly conventional mobile

computing devices with built-in GPS receivers and pedometer functions, can be put. As a result,

under the first step of Alice, the claims are directed at an abstract idea: the collection, analysis,

and display of data.

This conclusion is reinforced by the Federal Circuit's determination that claims are also

directed to abstract ideas if they "merely implement an old practice in a new environment."

FairWarning IP, 839 F.3d at 1094. In FairWarning, the court confronted patent claims that were

directed to a computerized "method of detecting improper access of a patient's protected health

information" that involved "generating a rule for monitoring audit log data" based on "access in

excess of a specific volume, accesses during a pre-determined time interval, [and] accesses by a

specific user"; applying the rule to the data to determine whether any such access had been

achieved; storing, "in a memory, a hit if the event has occurred"; and providing a notification of

the event. Id. at 1092. The Federal Circuit held that these claims were directed to an abstract idea

under Alice because the claimed rules reflected "the same questions" that "humans in analogous

situations detecting fraud have asked for decades, if not centuries." Id. at 1095. Although the

claims required a computer, "it is this incorporation of a computer, not the claimed rule, that

purportedly improves the existing technological process by allowing the automation of further

tasks," and although the claims "purport[ed] to accelerate the process of analyzing audit log data,

the speed increase comes from the capabilities of a general-purpose computer, rather than the

patented method itself." Id. (internal quotation marks omitted) (alterations omitted).

14

SmarTEN's asserted claims function similarly. They reflect a practice that humans have been engaging in for decades, if not centuries: monitoring and improving one's health by managing nutrition and exercise. Although the claims require a mobile computing device and purport to enhance the process of analyzing health-related data, the purported advances come from the capabilities of a conventional mobile computing device, rather than from anything specific to the asserted device itself. See also DietGoal Innovations LLC v. Bravo Media LLC, 33 F. Supp. 3d 271, 284 (S.D.N.Y. 2014), aff'd, 599 F. App'x 956 (Fed. Cir. 2015) (finding claims directed to a "computerized method of selecting meals that align with the user's individual preferences and nutritional goals (for example, by planning out dinners for the week that accord with a low-calorie diet) and calculating the dietary impact of the addition or subtraction of certain foods (for example, by determining how many calories you will save by swapping out French fries for broccoli)" ineligible under § 101 because these are "conventional and quotidian tasks" that humans do regularly and the patent "merely provides a new and presumably better method for calculating and visualizing the dietary impact of certain food choices," which is "not the kind of 'discover[y]' that § 101 was designed to protect" (alteration in original) (internal quotation marks omitted).[5] Accordingly, it is clear that plaintiff's claims are directed to an abstract idea.

2. Inventive Concept

Under the second Alice step, the Court must "consider the elements of the claim, both individually and as an ordered combination, to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea." Two-Way Media Ltd. v. Comcast Cable Comms., LLC, 874 F.3d 1329, 1338 (Fed. Cir. 2017). This analysis is, at

---

[5] Plaintiff's brief in opposition to the Motion to Dismiss does not respond to defendant's arguments drawn from FairWarning and DietGoal, or even mention these cases.

15

its core, a search for an "inventive concept," or something that ensures "that the patent in practice amounts to significantly more than a patent" upon the abstract idea itself. Alice, 134 S. Ct. at 2355 (internal quotation marks omitted). Although the Federal Circuit has not produced an enumerated list of such "inventive concepts," it has held that merely "reciting the use of a generic computer . . . cannot convert a patent-ineligible abstract idea into a patent-eligible invention." Two-Way Media, 874 F.3d at 1338.

Here, again, a comparison to Electric Power Group is useful. In that case, the Federal Circuit held that the claims were not sufficiently inventive: they "d[id] not require a new source of type of information, or new techniques for analyzing it," nor did they "require any nonconventional computer, network or display components, or even a non-conventional and non-generic arrangement of known, conventional pieces." Electric Power Group, 830 F.3d at 1355. Indeed, "[n]othing in the claims, understood in light of the specification, require[d] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." Id. The claims asserted by SmarTEN are similar. They require gathering and storing data, but from sources such as a GPS, a digital camera, and a pedometer, as well as from the user inputting information. As the patent makes clear, all of these sources of information are conventional, and many mobile computing devices already contain the requisite GPS, digital camera, and pedometer capabilities. See, e.g., '640 patent 10:23-65, 44:62-64. Similarly, the claims do not provide for any new techniques of analysis, nor do they include any nonconventional structural components—or even nonconventional arrangements of conventional structural pieces. Instead, all of the necessary structural components are commonly included as part of a conventional mobile computing hand-held device, and the patent does not describe how the invention represents a "critical

advancement over the prior art" or an "unconventional technological solution . . . to a technological problem." Amdocs (Isr.) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288, 1300 (Fed. Cir. 2016); see also DietGoal, 33 F. Supp. 3d at 287 (finding that "creating customized lists by retrieving information by a stored database" and "manipulating data based on inputs from the user, making computations from stored data, and displaying the results on a visual display" are "conventional computer tasks" and employing them in the food-related data context does "nothing to 'transform' the nature of the claim from the mental process of meal planning into a novel method or unique application of that idea").

Rather than responding directly to this argument, SmarTEN argues that there is an inventive concept underlying the claims because the '640 patent contains "detailed statements of advantages" showing the inventiveness of the patent and because the "large combination of features in the [']640 patent claims ensure that any abstract ideas . . . are not broadly covered, but rather are tied down to ensure that the patent claims are not directed to any abstract idea by itself." Pl. Opp. 18-21. As discussed above, that the claimed device might have some advantages over prior health management applications is not sufficient to show an inventive concept. Instead, SmarTEN must identify something more that transforms the nature of the claim—for example, use of a new source of data or new techniques for analyzing that data, or use of nonconventional components or nonconventional arrangements of conventional components. For the reasons described above, SmarTEN is unable to identify any such inventive concept. In addition, the narrowing limitations in the claim do not demonstrate an inventive concept. The Federal Circuit has made clear, in post-Alice decisions,[6] that even narrow applications of non-

_____

[6] The single case that SmarTEN relies on for this narrowness argument, Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336 (Fed. Cir. 2013), predates the Alice decision

inventive concepts are not patent eligible. See, e.g., Smart Sys. Innovations, 873 F.3d at 1374 n.9

("The operative test here does not require concreteness and narrowness, see Alice, 134 S. Ct. at

2355, rather, the claims must have an inventive concept."); BuySAFE, Inc. v. Google, Inc., 765

F.3d 1350, 1353 (Fed. Cir. 2014) ("[T]he exclusion applies if a claim involves a[n] . . . abstract

idea, even if the particular . . . abstract idea at issue is narrow."); id. at 1355 ("At best, th[e

claims'] narrowing is an attempt to limit the use of the abstract . . . idea to a particular

technological environment, which has long been held insufficient to save a claim in this context."

(internal quotation marks omitted) (alterations omitted)). Therefore, it is clear that the asserted

claims do not involve any "inventive concept," and they are therefore patent-ineligible under

§ 101.

### III.  CONCLUSION

For the reasons stated above, the Motion to Dismiss will be granted and the Complaint

will be dismissed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _16_ day of March, 2018.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge

---

and does not include any discussion or application of the "inventive concept" (or any similar)
test.